UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Barbara Peterson,

    Plaintiff,

v.                                                                              Civil No. 12-327 (JNE/FLN)
                                                                                              ORDER
HealthEast Woodwinds Hospital,

    Defendant.

---

Richard A. Williams, Jr., and Megan A. Spriggs, R.A. Williams Law Firm, P.A., appeared for Plaintiff Barbara Peterson.

Sara Gullickson McGrane and Jessica M. Marsh, Felhaber, Larson, Fenlon & Vogt, P.A., appeared for Defendant HealthEast Woodwinds Hospital.

---

       Barbara Peterson brought this action against her former employer, HealthEast Woodwinds Hospital, in state court. She asserted claims for violations of the Family and Medical Leave Act (FMLA), Minnesota's whistleblower statute, and Minnesota's public policy. She also asserted claims for negligent infliction of emotional distress and intentional infliction of emotional distress. HealthEast removed the action from state court. The case is before the Court on HealthEast's Motion for Summary Judgment. For the reasons set forth below, the Court dismisses Peterson's FMLA claims and remands her remaining claims to state court.

## I.    BACKGROUND

       Peterson worked for HealthEast as a patient advocate from 2003 to 2010. Her responsibilities included investigating patient grievances, maintaining records of investigations, and communicating with patients and their families about their concerns.

       Cathy Einberger became Peterson's supervisor in May 2009. As soon as she began reporting to Einberger, Peterson thought that Einberger wanted to terminate her employment.

1

Peterson described her relationship with Einberger as "strained" because she did not feel that Einberger respected her years of experience as a patient advocate and because she was asked to engage in unethical behavior.

In August 2009, Einberger directed Peterson to remove from grievance files certain documents that could be discoverable in litigation against HealthEast and to destroy the documents. Einberger directed Peterson to retain only the grievance report and any correspondence to the patient or the patient's family. Einberger's directive applied to grievances dated on or after May 1, 2009.[1]

Peterson considered Einberger's request to remove information from grievance files "unethical." Peterson thought removal of the information would violate guidelines established by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO). She prepared files from May to October 2009 as Einberger had requested. Peterson did not destroy the information that she had removed from the grievance files. Instead, she retained the information in separate files. In response to Einberger's request, Peterson stated that she would not give the JCAHO incomplete files if it requested them and that Einberger herself would have to do so.

According to Peterson, Einberger wanted the information removed from the files before the JCAHO arrived to review the hospital. The JCAHO's review was expected to occur in the fall of 2009. Einberger also told Peterson that the hospital could not afford another WG case. In an affidavit, Peterson described the WG case as one in which the family of a deceased patient

---

[1] HealthEast "denies Peterson's allegations that she was instructed [to] remove relevant information from patient records." For present purposes, the Court assumes the truth of Peterson's assertions. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 928 n.2 (8th Cir. 2006) ("As in many employment discrimination cases, there are a number of factual disputes. Wells Fargo denies many of the incidents alleged and statements attributed to Wells Fargo employees. However, since this comes to us on a grant of summary judgment, we assume the truth of the plaintiff's properly supported allegations for purposes of our analysis.").

received a large financial settlement based in part on documents in the grievance record. At her deposition, which took place after she had signed the affidavit, Peterson testified that she did not "know any specifics" of the WG case and that she did not "recall the patient or even the incident."

Anticipating the JCAHO's review, Einberger asked Peterson whether the files were ready in early October 2009. Peterson responded that the files were ready.

In November 2009, Peterson received a verbal warning from Einberger for practicing outside the scope of her responsibility. Peterson had asked a patient to contact her before presenting to the emergency department, implied to co-workers that a physician lacked conflict-management skills, and provided information about a patient's medical condition to a nurse via telephone.

Approximately two months later, Einberger observed erratic behavior by Peterson. Peterson twice used an incorrect name for a patient's relative and appeared disoriented. Einberger described Peterson as "unsteady, slow speaking, watery eyes, drowsy, rambling/incoherent." At her deposition, Peterson explained that she had experienced an adverse drug reaction. As a result of her behavior, HealthEast suspended Peterson for one day. Einberger asked Peterson to propose an action plan to assure that Peterson would not appear at the hospital in a disoriented state. After rejecting Peterson's proposal, Einberger presented an action plan to Peterson.

On February 12, 2010, Peterson learned that her performance review would be "does not meet standards." She listed a number of alleged deficiencies, including a failure to know a computer program used at HealthEast, deficiencies in letters to patients and their families, and late or incomplete work. She expected to be terminated.

On February 23, 2010, Peterson had suicidal thoughts. The next day, she commenced a leave of absence from HealthEast under the FMLA. By letter dated February 24, 2010, HealthEast informed Peterson that she had "to present [her] manager with a Fitness for Duty Certificate prior to returning to work." In a letter dated February 25, 2010, Unum Group, HealthEast's FMLA administrator, informed Peterson that she had "to present [her] manager with a fitness-for-duty certificate as a condition of being restored to employment."

While Peterson was on FMLA leave, she had several conversations with Thomas Schmitt, HealthEast's operations executive. The first took place approximately one week after Peterson's FMLA leave commenced. During the first conversation, Schmitt agreed to be Peterson's contact at HealthEast during her leave, Schmitt stated that he would discuss with Peterson the possibility of an alternative position, and Peterson told Schmitt that she could not return to her position under Einberger's supervision.[2]

In March, Schmitt and Peterson spoke on one or two occasions. They discussed her progress, but they did not discuss her return to work.

Schmitt and Peterson spoke in April and early May. During those conversations, they discussed her return to work. According to Peterson's deposition testimony, she indicated that her doctor "is willing to release [her] to return to work maybe part time at first, but then moving into full time" as long as she was "under alternative supervision." Peterson proposed an evening

---

[2] At her deposition, Peterson was asked: "[D]id you tell [Schmitt] that you could not go back to your prior position under Cathy Einberger?" She responded "Yes." Peterson also stated: "He knew I could not do that."
Schmitt's testimony on this point differed. At his deposition, he was asked: "At any point in time while [Peterson] was on leave and you were discussing with her how is she -- you know, discussing her coming to work, did she ever indicate to you that she could not come back to work under Cathy Einberger? Did she indicate clearly that she could not come back to work under Einberger?" Schmitt responded: "I don't believe [Peterson] stated that she could not. She did state that it would not be her preference."

4

position in the emergency room. Later, Schmitt rejected Peterson's proposal and told her she should keep pounding the pavement.[3] Peterson understood Schmitt's comment: "I knew what he was talking about as I was apprising him when I started to get my strength back by the end of March that I had -- I had been considering and kind of putting feelers out there for alternative jobs and that they weren't coming up." Asked whether the position that she had proposed to Schmitt was her former position, Peterson testified that it would have been a newly created position. The conversations in early May were the last conversations that Schmitt and Peterson had.

Schmitt's FMLA leave expired on May 18, 2010. Schmitt testified that he left a voicemail message for Peterson approximately three days after the expiration of her FMLA leave. Peterson denied receiving the message.

In a letter dated May 28, 2010, HealthEast informed Peterson that her FMLA leave had expired on May 18, 2010, and that certain benefits would be discontinued on May 31 unless she elected to continue them under COBRA. By letter of the same date, Unum approved Peterson's request for long-term disability benefits "because [she was] unable to work due to [her] medical condition of depression."[4] Peterson received long-term disability benefits for 24 months, the maximum period allowed by the policy.

---

[3] At his deposition, Schmitt was asked: "Do you ever recall using the expression, 'You might want to continue pounding the pavement to look for other opportunities,' or something to that effect?" He responded: "Something to that effect. I don't use the terminology 'pound the pavement.'" He also stated that the phrase is not something he would say and that he would "encourag[e] someone to find a good fit for their skill set."

[4] According to Unum's letter, the policy defined disability as: "you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury" and "you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."

Having heard of an e-mail that indicated she had resigned,[5] Peterson contacted HealthEast on June 7, 201, to ask about her employment status. At her deposition, she testified that she had asked whether there was "a termination letter in process or coming." She did not recall what, if any, response she received.

By letter dated June 11, 2010, HealthEast terminated Peterson's employment. The letter stated:

> In your Leave of Absence written communication dated February 26, 2010, we asked you to stay in touch with us during your leave regarding your intent to return to work.
>
> While you and Tom Schmitt did talk a few times during your leave, we have heard nothing from you since the end of April, and you have not returned Tom's phone message left for you on May 21, 2010. The only contact with you was your call to the Human Resources Coordinator on June 7, 2010, asking if we had sent you a termination letter and inquiring about disability benefits.
>
> Since your FMLA leave expired on May 18, 2010, and since you have neither returned to work nor requested additional leave, we are terminating your employment effective immediately for failing to return from a leave of absence.

## II. DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the

---

[5] No such e-mail appears in the record.

record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Family and Medical Leave Act**

"The FMLA entitles an employee to twelve weeks of leave from work during any twelve-month period if the employee meets certain statutory requirements." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). The Act "makes it unlawful for an employer to 'interfere with, restrain, or deny the exercise of or the attempt to exercise' rights provided under the FMLA." *Id.* (quoting 29 U.S.C. § 2615(a)(1) (2006)). "The Act also makes it unlawful for 'any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA." *Id.* (quoting 29 U.S.C. § 2615(a)(2) (2006)). The Eighth Circuit has recognized three types of claims that arise under § 2615(a)(1) and § 2615(a)(2): interference or entitlement claims, retaliation claims, and discrimination claims. *Brown v. City of Jacksonville*, 711 F.3d 883, 890-91 (8th Cir. 2013); *Pulczinski*, 691 F.3d at 1005-06.

*Interference*

Peterson claims that HealthEast failed to restore her to the same position or its equivalent. "Upon return from FMLA leave, an employee is entitled to be restored to the same position held prior to the beginning of the leave, or its equivalent, in terms of benefits, pay and other terms and conditions." *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006). "However, an employee is not entitled to restoration if, at the end of the FMLA leave period, the employee is still unable to perform an essential function of the job." *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 677 (8th Cir. 2001); *see Reynolds v. Phillips & Temro Indus., Inc.*, 195 F.3d 411, 413-14 (8th Cir. 1999).

7

In this case, it is undisputed that Peterson received twelve weeks of FMLA leave. During her leave, she communicated on several occasions with Schmitt. Approximately one week into her leave, Peterson testified that she told Schmitt she could not to return to her prior position under Einberger. Schmitt testified that Peterson told him that she preferred not to return to work under Einberger. During conversations in April and early May, Peterson and Schmitt discussed her return to work. She told Schmitt that her doctor was willing to release her to work "maybe part time at first, but then moving into full time" as long as she was "under alternative supervision." She proposed a newly created position to Schmitt. He ultimately rejected the proposal and, knowing that she had tentatively sought employment elsewhere without success, allegedly told her to keep pounding the pavement. Upon the expiration of her leave, Peterson did not attempt to return to HealthEast. Instead, representing that she was unable to work because of her depression, she applied for and received long-term disability benefits. Viewed in the light most favorable to Peterson, the record reveals that HealthEast did not interfere with Peterson's right to restoration because she was unable to work at the end of her twelve weeks of leave. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272-73 (3d Cir. 2012); *Hearst v. Progressive Foam Techs., Inc.*, 641 F.3d 276, 280 (8th Cir. 2011).

*Retaliation*

Peterson asserts that HealthEast retaliated against her for taking FMLA leave by terminating her employment.[6] The parties addressed the claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bosley v. Cargill Meat Solutions Corp.*, 705 F.3d 777, 783-84 (8th Cir. 2013); *Phillips v. Mathews*, 547 F.3d 905,

---

[6] The parties characterized Peterson's claim as one for retaliation. The Court proceeds accordingly. *See Brown*, 711 F.3d at 891; *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 754 n.7 (8th Cir. 2011).

8

912 (8th Cir. 2008). Peterson must first establish a prima facie case of retaliation. *See Bosley*, 705 F.3d at 784. To establish a prima facie case of retaliation, she must demonstrate that she exercised rights afforded by the FMLA, that she experienced an adverse employment action, and that there is a causal connection between the exercise of her FMLA rights and the adverse employment action. *See id.* If Peterson establishes a prima facie case, then HealthEast must "come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action." *See Phillips*, 547 F.3d at 912. If HealthEast does so, then Peterson must come forward with evidence that HealthEast's proffered reason is pretext for retaliation. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

HealthEast concedes for present purposes that Peterson exercised FMLA rights and experienced an adverse employment action. HealthEast asserts that summary judgment is appropriate because she cannot demonstrate a causal connection between her termination and her FMLA leave. In addition, HealthEast contends that Peterson cannot demonstrate that its legitimate, nondiscriminatory reason for her termination—her failure to return at the end of her FMLA leave—is pretext for retaliation.

Assuming that Peterson established a prima facie case of retaliation, the Court turns to whether she has identified evidence that would create a genuine issue of material fact as to whether HealthEast's proffered reason for her termination is pretext for retaliation. Peterson notes that HealthEast assigned her duties as patient advocate to Einberger when Peterson took leave; that Schmitt rejected her proposal for a newly created position; that Schmitt told her to pound the pavement; that she maintained contact with Schmitt over the course of her leave; and that Schmitt did not serve as a reference for Peterson during her post-termination search for

9

employment. Peterson has not demonstrated that HealthEast's proffered reason for her termination is pretext for retaliation.

HealthEast's decision to assign the duties of patient advocate to Einberger when Peterson took leave is not evidence that HealthEast's proffered reason for her termination is pretext for retaliation. Peterson acknowledged that "the patient advocate is a mandated position that needed to be covered during [her] leave."[7]

Schmitt's rejection of Peterson's proposal of a newly created position and statements that she should pound the pavement are not evidence that HealthEast's proffered reason for her termination is pretext for retaliation. As already noted, Peterson testified that she had told Schmitt she could not return to her prior position under Einberger. Schmitt testified that Peterson had stated she preferred not to return to work under Einberger. In any case, Schmitt and Peterson discussed her return to work in April and May. Peterson told Schmitt her doctor was willing to release her to return to work "maybe part time at first, but then moving into full time" as long as she was "under alternative supervision." Peterson proposed a newly created position that Schmitt ultimately rejected. Knowing that Peterson's attempts to find employment outside of HealthEast were not fruitful, Schmitt told her to keep pounding the pavement. The record does not contain any evidence that her doctor released her to work. The discussions between Schmitt and Peterson more than a month before her termination about her return to a newly created position or her search for employment elsewhere do not indicate that HealthEast's proffered reason for her termination is pretext for retaliation.

---

[7] Questioning Einberger's qualifications to assume the duties of patient advocate, Peterson criticizes HealthEast's decision to assign the duties to Einberger. The Court does not sit as a super-personnel department that second guesses the wisdom of an employer's personnel decisions. *E.g.*, *Ward v. Int'l Paper Co.*, 509 F.3d 457, 462 (8th Cir. 2007).

10

Peterson and Schmitt had several conversations during her leave. Their last conversation took place in early May, a couple of weeks before the expiration of her FMLA leave. A few days after her leave had expired, Schmitt left a voicemail. Peterson did not receive it. A few weeks later, in early June, Peterson contacted HealthEast after she had heard of an e-mail that indicated she had resigned. She made no attempt to return to work. By letter dated June 11, 2010, HealthEast "terminat[ed] [her] employment effective immediately for failing to return from a leave of absence." That Peterson maintained contact with Schmitt over the course of her leave is not evidence that HealthEast's proffered reason for her termination is pretext for retaliation.

Finally, Schmitt's failure to serve as a reference during Peterson's post-termination search for employment is not evidence that HealthEast's proffered reason for her termination is pretext for retaliation. Schmitt testified that he asked HealthEast's human resources department what reference he could give, that he was told he could not provide anything except verification of employment dates, and that he did not "see any value" in providing that information, which potential employers could obtain from HealthEast's human resources department.

In short, assuming that Peterson established a prima facie case of retaliation, HealthEast proffered a legitimate, nondiscriminatory reason for her termination: "failing to return from a leave of absence." *See Dorsey v. Jacobson Holman, PLLC*, 476 F. App'x 861, 863 (D.C. Cir. 2012) ("Jacobson Holman offered a lawful reason for terminating Dorsey: that she remained absent from work after her leave expired."); *King v. Preferred Technical Grp.*, 166 F.3d 887, 893 (7th Cir. 1999) ("King was terminated pursuant to these well-established policies after she failed to return to work at the expiration of her leave of absence. This explanation is both reasonable and non-discriminatory."). Peterson has not come forward with evidence that HealthEast's

proffered reason for her termination is pretext for retaliation. The Court grants HealthEast summary judgment on Peterson's FMLA retaliation claim. *See Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) ("The record contains no evidence establishing a causal connection between Killian's medical leave and her termination. Instead, the evidence reveals that Yorozu terminated her because she was absent on her return-to-work date.").

**B.     State-law claims**

Peterson's remaining claims are within the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (2006). A district court may decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). Having dismissed Peterson's FMLA claims, the Court declines to exercise supplemental jurisdiction over her remaining claims. *See Mo. Roundtable for Life v. Carnahan*, 676 F.3d 665, 678 (8th Cir. 2012); *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726-27 (8th Cir. 2008); *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005). The Court remands them to state court. *See Lindsey v. Dillard's, Inc.*, 306 F.3d 596, 599 (8th Cir. 2002).

**C.     Rule 56(d)**

Two weeks after the Court heard HealthEast's motion, Peterson filed a Motion Pursuant to FRCP 56(d).[8] Peterson asked the Court to deny or defer ruling on HealthEast's motion pending disposition of her motion to reopen and compel discovery. She filed the motion to reopen and compel discovery on May 15, 2013, the day before the Court heard HealthEast's motion and more than five months after the discovery deadline. According to Peterson's memorandum in support of her Rule 56(d) motion, the documents that she seeks "are relevant to

---

[8]     A party "must stake his claim to protection under Rule 56(d) at the time he responds to the summary judgment motion (or, at least, at some time before the nisi prius court passes on that motion)." *Nieves-Romero v. United States*, No. 12-1193, 2013 WL 1849159, at *5 (1st Cir. May 3, 2013).

critical issues in [her] case, mainly they may contain information which would support [her] claims that she was instructed to purge existing files and remove relevant documents and documents which may reflect negatively upon [HealthEast] in the event of litigation." Peterson also asserts that "[t]he documents which have not been provided are critical to [her] claim of violation of public policy." As already noted, the Court has assumed the truth of Peterson's assertion that she was instructed to remove and destroy documents from grievance files. *See Twymon*, 462 F.3d at 928 n.2. Peterson failed to articulate how the documents sought would influence disposition of her FMLA claims. The Court has declined to exercise supplement jurisdiction over her state-law claims. The Court denies her Rule 56(d) motion. *See Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.*, 687 F.3d 1045, 1050 (8th Cir. 2012); *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995).

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Peterson's Motion Pursuant to FRCP 56(d) [Docket No. 69] is DENIED.

2. HealthEast's Motion for Summary Judgment [Docket No. 41] is GRANTED IN PART.

3. Count One of Peterson's Complaint is DISMISSED WITH PREJUDICE.

4. Counts Two, Three, Four, and Five of Peterson's Complaint are REMANDED to the Second Judicial District of the State of Minnesota.

5. The Clerk of Court shall mail a certified copy of this Order to the clerk of the Second Judicial District of the State of Minnesota.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 3, 2013

                                                  s/Joan N. Ericksen
                                                  JOAN N. ERICKSEN
                                                  United States District Judge